

**SIGNED this 28th day of August, 2014.**

_____
**TONY M. DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 13-10570-TMD |
| UPH HOLDINGS, INC. *et al.,* | § | (Jointly Administered) |
| | § | |
| Debtors. | § | CHAPTER 11 |

| | | |
|---|---|---|
| LOWELL FELDMAN LIQUIDATING | § | |
| TRUSTEE OF UPH LIQUIDATING TRUST, | § | |
| Plaintiff, | § | |
| | § | ADV. NO. 13-01094-TMD |
| v. | § | |
| | § | |
| T-MOBILE USA, INC., | § | |
| Defendant. | § | |

## MEMORANDUM OPINION DENYING MOTIONS TO DISMISS

Termination: This word applies to much of what is going on in these adversary proceedings.[1]  Defendants, Leap Wireless International, Inc., Cricket Communications, Inc., Sprint Nextel Corp., Sprint Communications Company L.P. and T-Mobile USA, Inc., filed Motions to Dismiss in their respective adversary proceedings seeking to terminate these suits on the basis that Plaintiff, Lowell Feldman, Liquidating Trustee of the UPH Liquidating Trust,[2] failed to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Should Defendants succeed in terminating these suits, Plaintiff's prospects for a material distribution to creditors in this bankruptcy case may be terminated, as these are the largest suits Plaintiff has on file to recover money for creditors of UPH.[3]  But termination has another meaning that is more precise and technical. Plaintiff seeks to recover for performing the service of "termination," which, counterintuitively, means completing cell phone calls that have originated with Defendants' customers, by connecting those calls to the call recipients. For the reasons that follow as to the intraMTA issues, and as stated on the record of today's date as to the interMTA issues, the Motions to Dismiss filed by the Defendants are denied.

---

[1] *UPH v. Leap Wireless Int'l., Inc.,* Adv. No. 13-1102; *UPH v. Sprint Nextel Corp.,* Adv. No. 13-1096; and *UPH v. T-Mobile USA, Inc.,* Adv. No. 13-1094.

[2] These adversary proceedings were initially filed by Pac-West Telcomm, Inc., Tex-Link Communications, Inc., UniPoint Holdings, Inc., UniPoint Enhanced Services, Inc., UniPoint Services, Inc., nWire, LLC, and Peering Partners Communications, LLC.  On August 6, 2014, the Court entered an order substituting Lowell Feldman, Liquidating Trustee of the UPH Liquidating Trust as Plaintiff in adversary proceeding numbers 13-1102 and 13-1094.  Presumably, a Motion to Substitute Mr. Feldman will be filed in adversary proceeding number 13-1096 as well.

[3] Plaintiff seeks almost $19 million from Leap, $19 million from T-Mobile, and $5.4 million from Sprint.

## I. Background

### A. <u>Case Summary: What Plaintiff Seeks</u>

Defendants are commercial mobile radio service ("CMRS") providers.[4] Pac-West Telecomm, Inc. ("Pac-West") is a CLEC, or competitive local exchange carrier.[5] When a cell phone customer places a call to someone served by Pac-West's network, Pac-West has no choice but to complete (terminate) the call by connecting it to the called party. When that call is placed within a defined geographic area called a "major trading area" or MTA,[6] it is called an intraMTA call, and Plaintiff believes Pac-West is entitled to "reasonable compensation" for terminating that call under 47 C.F.R. § 20.11(b) ("Rule 20.11").[7] When that call is made from one MTA to another MTA, it is called an interMTA call, and in that situation, Plaintiff believes Pac-West is entitled to collect a tariffed charge for terminating the call. In the alternative, contends Plaintiff, if the tariff that would otherwise apply to the interMTA call is invalid, as Defendants have alleged, Pac-West can recover under quasi-contract or under state law equitable remedies such as quantum meruit or unjust enrichment. Defendants argue that Pac-West is not entitled to any

---

[4] A CMRS is "[a] mobile service that is: (a)(1) provided for profit, *i.e.*, with the intent of receiving compensation or monetary gain; (2) An interconnected service; and (3) Available to the public, or to such classes of eligible users as to be effectively available to a substantial portion of the public; or (b) The functional equivalent of such a mobile service described in paragraph (a) of this section." 47 C.F.R. § 20.3(2) (2013). Another common term for these entities is cellular telephone providers. Certain of the Defendants dispute their designation as such. For now, the Court will accept the facts as alleged by Plaintiff, subject to discovery and proof.

[5] A Local Exchange Carrier (LEC) refers to "any person that is engaged in the provision of telephone exchange service or exchange access." 47 U.S.C. § 153(26) (2001) (the 2001 statute was amended by 47 U.S.C. § 153 (2010)). A CLEC means "a local exchange carrier that provides some or all of the interstate exchange access services used to send traffic to or from an end user" competing with other, established carriers called ILECs (Incumbent Local Exchange Carriers). 47 C.F.R. § 61.26(a)(1) (2013). An ILEC, in a given area, is the LEC that provided telephone exchange services in that area on the date of the enactment of the 1996 Telecommunications Act. 47 U.S.C. § 251(h)(1) (2001).

[6] See the map attached to T-Mobile USA's Mot. to Dismiss Pl.'s Second Am. Compl. at Ex. A, *UPH v. T-Mobile USA, Inc.*, No. 13-1094 (Bankr. W.D. Tex. Mar. 28, 2014), ECF No. 67.

[7] During the relevant time frame, Rule 20.11(b)(2) stated: "A commercial mobile radio service provider shall pay reasonable compensation to a local exchange carrier in connection with terminating traffic that originates on the facilities of the commercial mobile radio service provider." 47 C.F.R. § 20.11(b)(2) (2011) (the 2011 statute was amended by 47 C.F.R. § 20.11 (2012)).

payment because "reasonable compensation" should be construed as, literally, nothing, and also say that this court should defer to the Federal Communications Commission ("FCC") or state regulators through a primary jurisdiction referral.  Further, Defendants contend that the state law theories under which Plaintiff seeks to recover are preempted by federal telecommunication laws and regulations.

### B. **Regulatory Background**

The FCC was created eighty years ago to regulate wire and radio communications by the Communications Act of 1934 (the "1934 Communications Act").  *In re FCC,* 753 F.3d 1015, 1035 (10th Cir. 2014) (citing 47 U.S.C. § 151)).  The FCC's mandate was later expanded to cover telephone service, *id*, and to include the wireless industry. Leonard J. Kennedy & Heather A. Purcell, *Section 332 Of The Communications Act Of 1934: A Federal Regulatory Framework That is "Hog Tight, Horse High, and Bull Strong,"* 50 Fed. Comm. L.J. 547, 561 (1998).  The 1934 Communications Act allowed the FCC to regulate interstate and foreign communications, but reserved intrastate regulation for the states.  *Id.* at 555-56.

When mobile phone technology first developed, Congress was faced with the challenge of integrating cell phones into a regulatory structure that was shared between the FCC and state public utility commissions, and that was originally tasked to regulate landline technology operating in a monopolized industry.  *Id.* at 559-60.  To address this challenge, Congress in 1993 gave the FCC authority over CMRS providers.  *Id.* at 560-61.  In this legislation, Congress limited, but did not eliminate, the state's regulatory authority.  *Id.* at 559-65, 753.

Then, in 1996, Congress amended the 1934 Communications Act with the 1996 Telecommunications Act (the "1996 Telecommunications Act").  *In re FCC 11-161*, 753 F.3d at 1036 (citing *Qwest Corp. v. FCC*, 258 F.3d 1191, 1196 (10th Cir. 2001)).  In doing so, Congress

sought to restructure local telephone markets by introducing competition between LECs into those markets, while preserving service to all users. *Id.* This promised to be a challenge. As noted by one commentator:

> The [1996 Telecommunications Act] envisions competitive, deregulated telecommunications markets, in which services are provided by multiple complementary and competing interconnected networks. Unfortunately, the existing patchwork of interconnection regimes, which are based on such historical, regulatory distinctions as local vs. long-distance, interstate vs. intrastate, and basic vs. enhanced, was not designed for competitive and deregulated telecommunications markets, and may not facilitate the efficient development of competition in telecommunications markets. Moreover, the existing interconnection regimes may not be sustainable in increasingly competitive telecommunications markets.

Patrick DeGraba, *Bill and Keep at the Central Office as the Efficient Interconnection Regime* 1 (Federal Communications Commission, Office of Plans and Policy, Working Paper No. 33, Dec. 2000), www.fcc.gov/Bureaus/OPP/working_papers/oppwp33.pdf (citing 47 U.S.C. § 151).

It is hardly surprising that the 1996 Telecommunications Act has not completely resolved these conflicting constraints:

> It would be gross understatement to say that the 1996 [Telecommunications] Act is not a model of clarity. It is in many important respects a model of ambiguity or indeed even self-contradiction. That is most unfortunate for a piece of legislation that profoundly affects a crucial segment of the economy worth tens of billions of dollars.

*AT&T Corp. v. Iowa Util. Bd.*, 525 U.S. 366, 397 (1999).

The FCC has struggled with these constraints in developing rules for compensation between telecommunication carriers. Under most historic regimes governing intercarrier compensation, the calling party's carrier has been required to pay the called party's carrier for terminating the call.[8] In some circumstances, carriers have charged or attempted to charge for

---

[8] *See* DeGraba, *supra*, at 2, 4-5 (citing *In re Implementation of the Local Competition Provisions in the Telecomm. Act of 1996* (the "*Local Competition Order*"), 11 FCC Rcd. 15499, 16024-25 (1996), *aff'd in part and*

terminating calls by filing a tariff. *In re Developing a Unified Intercarrier Comp. Regime*, 20 FCC Rcd. 4855, 4856 (2005) (the "*T-Mobile Declaratory Order*"). However, with respect to intraMTA calls, the FCC eliminated the use of tariffs by CMRSs in 2002 and by all LECs in 2005. *Id.* (amending rules to prohibit the use of tariffs to impose compensation obligations). Moreover, the FCC began a rulemaking process in 2001, which was largely completed in 2011, that prohibited the collection of termination charges for intraMTA calls by one carrier from another carrier. *In re Connect America Fund*, 26 FCC Rcd. 17663, 17676 (Nov. 18, 2011) (the "*CAF Order*"). Carriers are now required to collect the cost of terminating calls from their own customers. *Id.* This regime, called "bill-and-keep," was established by the *CAF Order*[9] and generally applies to intraMTA traffic between CMRS providers and CLECs as of December 29, 2011, and as of July 1, 2012 for carriers with interconnection agreements.[10] *In re Connect America Fund*, 26 FCC Rcd. 17633, 17635-36 (Dec. 23, 2011) (the "*CAF Order on Reconsideration*").

The question, then, is whether the law in effect prior to the operative date of the *CAF Order* allows Pac-West to collect termination charges from CMRSs. Section 201 of the 1996 Telecommunications Act simply says all charges have to be "just and reasonable."[11] Section 251(a) imposes a general duty on each telecom carrier to interconnect with other telecom

---

*vacated in part sub nom*; *Competitive Telecomms. Ass'n v. FCC*, 117 F.3d 1068 (8th Cir. 1997); *Iowa Utils. Bd. v. FCC*, 120 F.3d 753 (8th Cir. 1997), *aff'd in part and remanded*, *AT&T v. Iowa Utils. Bd.*, 525 U.S. 366 (1999)).

[9] The *CAF Order* was issued on November 18, 2011 and adopted "a uniform national bill-and-keep framework as the ultimate end state for all telecommunications traffic exchanged with a LEC." *CAF Order*, 26 FCC Rcd. at 17676 (2011); *see also* 47 C.F.R. § 51.705 (2013) (codifying the bill-and-keep framework in the Code of Federal Regulations).

[10] Plaintiff argues that the bill-and-keep effective date for this case is July 1, 2012, on the assumption that he can establish a quasi-contract.

[11] "All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful…" 47 U.S.C. § 201(b) (2001).

carriers.[12] Under section 251(b), each local exchange carrier (including a CLEC such as Pac-West) has a duty to "establish reciprocal compensation arrangements for the transport and termination of telecommunications."[13]  Section 251(c) then imposes the additional duty on incumbent local exchange carriers ("ILECs") to negotiate terms and conditions of interconnection, including the amounts payable for terminating calls.[14]  The process by which ILECs, but not CLECs or CMRSs, can obtain an interconnection agreement through voluntary negotiation or compulsory arbitration is set forth in section 252.[15]

Rule 20.11 was initially published in the Federal Register at 59 Fed. Reg. 18495 (Apr. 19, 1994) (codified at 47 C.F.R. § 20.11).[16] The exact text of 20.11(b), as promulgated in 1994, and as in effect until December 28, 2011, provided:

 (b) Local exchange carriers and commercial mobile radio service providers shall comply with principles of mutual compensation.

(1) A local exchange carrier shall pay reasonable compensation to a commercial mobile radio service provider in connection with terminating traffic that originates on facilities of the local exchange carrier.

(2) A commercial mobile radio service provider shall pay reasonable compensation to a local exchange carrier in connection with terminating traffic that originates on the facilities of the commercial mobile radio service provider.

*Implementation of Sections 3(N) and 332*, 9 FCC Rcd. at 1520-21; *see also id.* at 1498 ("[t]he principle of mutual compensation shall apply, under which LECs shall compensate CMRS

---

[12] "Each telecommunications carrier has the duty— (1) to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers; …." 47 U.S.C. § 251(a)(1) (2001).

[13] 47 U.S.C. § 251(b) (2001).

[14] 47 U.S.C. § 251(c) (2001). These negotiated or arbitrated agreements are generally referred to as interconnection agreements.

[15] 47 U.S.C. § 252 (2001).

[16] It was adopted in the Second Report and Order, *In re Implementation of Sections 3(N) and 332 of the Communications Act Regulatory Treatment of Mobile Services*, 9 FCC Rcd. 1411 (1994).

providers for the reasonable costs incurred by such providers in terminating traffic that originates

on LEC facilities. CMRS providers, as well, shall be required to provide such compensation to

LECs in connection with mobile-originated traffic terminating on LEC facilities."); *T-Mobile*

*Declaratory Order*, 20 FCC Rcd. at 4856 ("In particular, the rules required the originating

carrier, whether LEC or CMRS provider, to pay reasonable compensation to the terminating

carrier in connection with traffic that terminates on the latter's network facilities.")

In order to better understand the law governing inter-carrier compensation for intraMTA

traffic, both now and during the time relevant to these lawsuits, it is helpful to review a number

of rulemaking proceedings and regulatory adjudications.

### 1.  Local Competition Order - 1996

As previously stated, the 1996 Telecommunications Act was designed to promote

competition in local telephone markets.  *In re FCC 11-161*, 753 F.3d at 1036.  The *Local

Competition Order* (an "oldie but goodie" according to one of Defendants' lawyers)[17]

implemented the 1996 Telecommunications Act in a number of ways.  The FCC acknowledged

that it had to incentivize CLECs to compete with ILECs in the markets served by the ILECs,

recognizing that the ILECs already owned the communication equipment (lines and switches)

needed to provide local phone services.  *Local Competition Order*, 11 FCC Rcd. at 15508-10.

The FCC ruled that CLECs could lease this equipment from ILECs, and must be allowed to do

so at a low, cost-based, regulated rate.  *Talk America, Inc. v. Michigan Bell Telephone Co.*, 131

S. Ct. 2254, 2261 (2011) (citing 47 C.F.R. § 51.321(a) (2010)).

The FCC also addressed the means by which other carriers could connect with LECs –

both ILECs and CLECs – including how to route telephone calls (or "traffic") from one customer

---

[17] Mot. To Dismiss Hr'g Tr. 103, February 7, 2014, *UPH v. T-Mobile*, No. 13-1094 (Bankr. W.D. Tex.  Feb. 7, 2014), ECF No. 54. *See Local Competition Order,* 11 F.C.C. Rcd. 15499 (1996).

(the calling party) to another customer (the called party). *Local Competition Order*, 11 FCC Rcd. at 15590. To facilitate this interconnection process, the FCC implemented the concept of "reciprocal compensation" as contemplated by section 251(b)(5). *Id.* In the *Local Competition Order*, the FCC noted that CMRS providers and all LECs are required to pay compensation for terminating traffic that originates with their customers and is terminated by other carriers. *Id.* at 16018. The FCC further contemplated that the rates at which the compensation would be paid would be determined by agreement among the affected carriers or by state public utility commissions charged with the task of arbitrating interconnection agreements. *Id.* at 16005, 16024. Although the FCC recognized that mandating compensation for terminating traffic would require carriers to measure traffic, the FCC believed that the cost of measuring that traffic would be outweighed by the benefits of having reciprocal compensation arrangements. *Id.* at 16018.

The FCC required that states setting rates for termination ultimately use a "TELRIC" (total element long-run incremental cost) cost methodology. *Id.* at 16024-25. One commentator explained this methodology as follows:

> TELRIC is a "forward-looking" cost methodology that analyzes how much it would cost a hypothetical, highly efficient carrier to perform the network functions in question if it built a new network today mostly from scratch. Although the resulting TELRIC-based cost estimates varied wildly from state to state, they typically produced reciprocal compensation rates for CLECs far lower than the access charges that ILECs received for terminating long-distance calls, even though the functions involved are often exactly the same.

Jonathan E. Nuechterlein & Philip J. Weiser, *Digital Crossroads: Telecommunications Law and Policy in the Internet Age* 251 (2d ed. 2013).

The FCC understood that setting these rates could be an expensive process for states, and so allowed states to use, on an interim basis, a default rate of .2 cents to .4 cents per minute of use. *Local Competition Order*, 11 FCC Rcd. at 16026.

The FCC thought that the TELRIC cost pricing method would encourage competition – and it apparently did. *CAF Order,* 26 FCC Rcd. at 17669. However, it may have created an opportunity for a form of regulatory arbitrage. *See* Nuechterlein & Weiser, *supra*, at 251-255 (describing arbitrage opportunities for CLECs that arose from the artificially set TELRIC-based termination rates). More specifically, Defendants in this case, and in many of the authorities cited in the briefs, allege that CLECs like Pac-West have developed business models in which they recruit customers with businesses that only or predominately receive calls, and receive a lot of calls. Def. Leap Wireless and Cricket's Corrected Mot. to Dismiss Second Am. Compl. at 2 n.6, *UPH v. Leap Wireless Int'l*, No. 13-1102 (Bankr. W.D. Tex. Mar. 3, 2014), ECF No. 55. Because, according to Defendants, the traffic only flows one way – in Pac-West's direction in our case – Pac-West is in a position to collect termination charges, but seldom pays termination charges for calls originated on its network, or by its customers. This activity has been variously described as "traffic pumping" or "traffic stimulation." *Id,* Nuechterlein & Weiser, *supra*, at 257-60. In the present posture of these cases, the Court has not considered the merits of these allegations.

Interestingly, in a discussion of bill-and-keep in the context of CMRS-LEC traffic, the FCC "concluded" that state commissions could impose bill-and-keep arrangements "if neither carrier has rebutted the presumption of symmetrical rates and if the volume of terminating traffic that originates on one network and terminates on another network is approximately equal to the volume of terminating traffic flowing in the opposite direction," and will remain that way. *Local*

*Competition Order*, 11 FCC Rcd. at 16054. The FCC also found, at that time, that termination costs were not *de minimis*, and that if the volume of traffic is not symmetrical, bill-and-keep is not economically efficient. *Id.* at 16055.

### 2. T-Mobile Declaratory Order - 2005

The proceeding that resulted in the *T-Mobile Declaratory Order* began with a request to terminate termination tariffs:

> On September 6, 2002, T-Mobile USA, Inc., Western Wireless Corporation, Nextel Communications and Nextel Partners jointly filed a petition for declaratory ruling asking the Commission to reaffirm "that wireless termination tariffs are not a proper mechanism for establishing reciprocal compensation arrangements for the transport and termination of traffic." The petitioners maintain that these tariffs are unlawful because they: (1) bypass the negotiation and arbitration procedures established in sections 251 and 252 of the [1996 Telecommunications] Act; (2) do not provide for reciprocal compensation to commercial mobile radio service (CMRS) providers; and (3) contain rates that do not comport with the Total Element Long-Run Incremental Cost (TELRIC) pricing methodology as required by the Commission's rules. The Commission incorporated the T-Mobile Petition into this proceeding and sought comment on the issues raised therein.

*T-Mobile Declaratory Order*, 20 FCC Rcd. at 4855.

Although the FCC denied the petition, it did amend its rules on a prospective basis to respond to the issues raised in the petition. *Id.* at 4855-56. First, the FCC prohibited the use of tariffs to impose termination obligations for CMRS traffic. *Id.* at 4856. Second, it recognized that LECs may be prejudiced because CMRS providers may have no incentive to negotiate, and addressed this by providing that "an incumbent LEC may request interconnection from a CMRS provider and invoke the negotiation and arbitration procedures set forth in section 252 of the 1996 Telecommunications Act. A CMRS provider receiving such a request must negotiate in good faith and must, if requested, submit to arbitration by the state commission." *Id.* at 4864-65. While the FCC acknowledged that CMRS providers may not have an incentive to negotiate, it nonetheless gave ILECs, but not CLECs, the ability to force CMRS providers to negotiate. *Id.* at

4864. The FCC did not explain why CLECs were not granted this right as well. Defendants in these cases argue this is in fact not unfair because CMRS providers cannot force CLECs to negotiate. But this, of course, does not address the problem arising when the traffic is mostly CMRS to CLEC.

In the instant case, T-Mobile states that in the *T-Mobile Declaratory Order*, the FCC clearly held that a LEC can only collect compensation under an interconnection agreement. T-Mobile USA's Mot. to Dismiss Pl.'s Second Am. Compl. at 10, *UPH v. T-Mobile USA, Inc.*, No. 13-1094 (Bankr. W.D. Tex. Mar. 28, 2014), ECF No. 67. This is flatly incorrect. The *T-Mobile Declaratory Order* only prohibits the use of tariffs to collect intraMTA charges. *T-Mobile Declaratory Order*, 20 FCC Rcd. at 4863. While there is an argument to be made that ILECs cannot collect compensation after this ruling absent at least a request to negotiate, *see id.* at 4863 n.57 (stating that under the amended rules, pertaining to ILECs, "in the absence of a request for an interconnection agreement, no compensation is owed for termination"), this argument cannot be applied to CLECs because they were not given the right to force an agreement with a CMRS.

### 3. North County Orders - 2009

North County, a CLEC, asked the FCC to order that MetroPCS, a CMRS, pay for terminating traffic, establish an interim compensation arrangement for termination of intrastate traffic, and enter into a final interconnection agreement. *N. Cnty. Commc'ns Corp. v. MetroPCS Cal., LLC*, 24 FCC Rcd. 3807, 3809 (2009) (the "*Bureau Merits Order*"). All the traffic went from the CMRS to the CLEC because the CLEC's chat line customers did not generate outbound calls, and its telemarketing customers could not call cell phones. *Id.* at 3808-09. The parties attempted, but were unable, to negotiate an interconnection agreement and the CLEC began to

12

bill the CMRS anyway. *Id.* The CMRS argued that no compensation was owed to the CLEC on the basis that the rule should be bill-and-keep. *Id.*

The FCC Enforcement Bureau[18] ruled that to collect termination charges, a rate must first be set by the California Public Utilities Commission (the "CA PUC"), and not by the FCC, as states have the authority to set such rates under section 2(b) of the 1934 Communications Act, and the FCC has not preempted this authority. *Id.* at 3810-11. The Enforcement Bureau also said that in setting this rate, the CA PUC is entitled to employ whatever "procedural method it deems appropriate under state law." *Id.*

In reaching this decision, the Enforcement Bureau looked to, among other things, the plain language of Rule 20.11:

> Construing the Commission's adjudicatory role under rule 20.11 as permitting states to determine in the first instance whether the charged rate is reasonable is perfectly consistent with the plain language of rule 20.11 and with the Commission's multiple orders - including the order adopting rules 20.11(a)-(b) - expressly declining to preempt state authority to establish intrastate rates charged by LECs to terminate traffic from CMRS providers.

*Id. at* 3811-12. But the Enforcement Bureau created some confusion by adding this in footnote 55:

> We make no determinations at this time as to whether rule 20.11 imposes obligations to pay compensation in the absence of an agreement, and if so, on what terms, or alternatively, whether the obligation under rule 20.11 is a mandate that the parties must enter into an agreement to a reasonable rate of mutual compensation. In either case, we find that resolution of the rule 20.11 claim depends first on the establishment of a reasonable rate.

---

[18] The FCC is a federal regulatory agency and has both rulemaking and adjudicatory functions. 47 U.S.C. § 155(c) (2011). In its rulemaking role, it has promulgated many rules that have application to the instant dispute, and that are discussed herein. It also has an adjudicatory role that is exercised in the first instance by its Enforcement Bureau, which is responsible for investigating potential illegal activity and enforcing rules and orders. 47 C.F.R. § 0.311 (2013). Decisions of the Enforcement Bureau can be appealed to the full FCC. 47 C.F.R. § 0.311(a)(2) (2013).

*Id.* at 3814. The Enforcement Bureau also determined that MetroPCS's refusal to enter into an interconnection agreement with North County did not violate the 1934 Communications Act. *Id.* at 3814-17.

In its review of the *Bureau Merits Order*, the FCC made clear that reasonable compensation was owed, but affirmed that the relevant state PUC should first set the rate. *N. Cnty. Commc'ns Corp. v. MetroPCS Cal., LLC*, 24 FCC Rcd. 14036 (Nov. 19, 2009) (the "*North County Order on Review*"), *aff'd MetroPCS Cal. LLC v. F.C.C.*, 644 F.3d 410, 413 (DC Cir. 2011). In its ruling, the FCC described the *Bureau Merits Order* as "thorough and well-reasoned." *Id.* at 14038. The parties only challenged that portion of the *Bureau Merits Order* that dismissed the reasonable compensation claim without prejudice. *Id.* at 14038. "In our view, for the reasons set forth in the *Bureau Merits Order* itself, the *Bureau Merits Order* was correct to conclude that the California PUC is the more appropriate forum for determining the reasonable compensation rate for North County's termination of intrastate, intraMTA traffic originated by MetroPCS." *Id.* at 14040. In paragraph 15 of the ruling, the FCC acknowledged that the only dispute in most instances between CLECs and CMRSs is the termination rate. This discussion also evidences the FCC's view that compensation is clearly owed:

> The parties lament that the *Bureau Merits Order* creates the risk of piecemeal litigation, which could be cumbersome, time-consuming, and expensive. The parties point out that they (and any future parties who are similarly situated) may have to litigate once to establish a rate, and then perhaps again to establish other interconnection terms and a damages amount. However, as the T-Mobile Declaratory Ruling observes, most small LECs, such as CLECs like North County, are only *indirectly* interconnected with CMRS carriers like MetroPCS. Consequently, if and when CLECs and CMRS carriers have interconnection disputes, it is likely that those disputes will largely, if not entirely, concern only compensation. Indeed, North County states here that the parties have agreed to all interconnection terms except North County's termination rate. Thus, we expect that, in most instances, litigation following a state commission's rate determination will either be unnecessary or relatively limited in scope. Accordingly, we do not find persuasive the parties' contention that allowing state

commissions to establish rates governing CLECs' termination of intrastate CMRS traffic will be procedurally onerous.

*Id.* at 14041-42.

The FCC did correct the *Bureau Merits Order* by ruling that the complaint should be held in abeyance, and not dismissed, so that North County would not be prejudiced during its attempts to get the rate set by the CA PUC. *Id.* at 14037. The FCC notes that after the rate is set, the matter can come back to the FCC, not to review the rate, but instead to determine:

> [W]hether, despite the application of the termination rate prescribed by California law, MetroPCS has still failed to pay North County "reasonable compensation" under rule 20.11. Such a dispute could arise from a myriad of factors, including but not limited to a continuing disagreement between the parties about whether and to what extent (i) North County's recovery should be limited by the statute of limitations, or (ii) North County is entitled to an award of prejudgment interest.

*Id.* at 14045. Notably, unlike footnote 55 of the *Bureau Merits Order*, there is no mention about reserving the question of liability.

### 4. California Public Utilities Commission Order – 2010

Based on the FCC's ruling, North County did as instructed and sought a determination of the rate from the CA PUC. *Application of N. Cnty. Commc'ns Corp. of Cal. (U5631C) for Approval of Default Rate for Termination of Interstate, IntraMTA Traffic Originated by CMRS Carriers*, 2010 Cal. PUC Lexis 195 at *1 (June 7, 2010) (the "*CA PUC Order*"). Unfortunately for North County, and for the state of the law on this issue, the CA PUC declined to provide relief. *Id.* In denying North County's request, the CA PUC relied heavily on footnote 55 of the *Bureau Merits Order*, which purported to reserve the liability question, and also stated that:

> We take to heart the Wireless Coalition's reminder to this Commission of the years of effort that the Commission and telecommunications companies spent in the unbundling proceedings of the 1990's that were rendered irrelevant by subsequent judicial and FCC actions, as well as by technological and market developments…In light of this experience [wasted rate setting for call services] and the current limitations on resources arising from California's budgetary

> constraints, it would certainly be unwise to proceed with a consideration of this application without a clear commitment from the FCC to use the results of California's regulatory efforts and a determination that MetroPCS is liable for payment to North County.

*Id.* at \*24-25. In the *North County Order on Review*, however, the FCC plainly stated that it would not review the rate set by the CA PUC, but rather, it would only review questions such as limitations and prejudgment interest. *North County Order on Review*¸ 24 FCC Rcd. at 14045. It is hard to see how the FCC could have made a clearer commitment.

In the *CA PUC Order*, the CA PUC stated that it made no sense to proceed without resolution of the D.C. Circuit appeal of the FCC's ruling on review of the *Bureau Merits Order*. *CA PUC Order*, 2010 Cal. PUC LEXIS 195 at \*25. Nevertheless, in response to a request for rehearing, the CA PUC stated that the two reasons for not providing a rate were "independent."[19] If that is so, then even though the D.C. Circuit has now ruled,[20] the CA PUC will still not set a rate, based on its premise as to what the FCC would do with the rate set by the CA PUC. It is hard to imagine that the CA PUC would be willing to set a rate now, given that the FCC has imposed bill-and-keep for traffic terminated after December 29, 2011. Having said that, this Court is sympathetic to "the current limitations on resources arising from California's budgetary constraints…," *id.* at \*24-25, and does not question the good faith of the CA PUC's decision not to embark on the ratemaking project.

Meanwhile, in a related request made by Pac-West, on March 24, 2011, the CA PUC dismissed actions by PAC-West against CMRSs without prejudice —on the same basis that the *North County* cases were dismissed. *Pac-West Telecomms., Inc. (U5266C) v. Sprint Spectrum,*

---

[19] *Application of N. Cnty. Commc'ns Corp. of Cal. (U5631C) for Approval of Default Rate for Termination of Interstate, IntraMTA Traffic Originated by CMRS Carriers*, 2012 Cal. PUC Lexis 136 at \*8-9 (March 8, 2012).

[20] *See generally MetroPCS Cal., LLC v. F.C.C.,* 644 F.3d 410 (D.C. Cir. 2011).

*L.P.,* 2011 Cal PUC Lexis 190 at *2 (March 24, 2011). This order also provided for a tolling of limitations, *id.* at *32-33, which clearly applies in these adversary proceedings to the parties to the CA PUC proceeding, all of whom are or may later be parties to these proceedings. This tolling is limited, however, to intraMTA claims over which the CA PUC would have jurisdiction.

The CA PUC noted that the *North County Order on Review* reached it following three and a half years of consideration by the FCC. *CA PUC Order*, 2010 Cal. PUC LEXIS 195 at *1. Thus, this issue has now been in play for at least seven and a half years.

### 5. Connect America Fund Order – 2011

The *CAF Order* was the culmination of a lengthy rulemaking process designed to address several aspects of fixed and mobile voice and broadband regulation. *CAF Order,* 26 FCC Rcd. at 17667. In pertinent part, the FCC sought to modernize the intercarrier compensation system by eliminating outmoded rules, fostering market-based pricing mechanisms, and concomitantly eliminating what it viewed as costly subsidies that no longer served a purpose. *Id.* Specifically, the FCC observed that:

> The intercarrier compensation system is similarly outdated, designed for an era of separate long-distance companies and high per-minute charges, and established long before competition emerged among telephone companies, cable companies, and wireless providers for bundles of local and long distance phone service and other services. Over time, [the intercarrier compensation regime] has become riddled with inefficiencies and opportunities for wasteful arbitrage.

*Id.* at 17663, and that:

> The system creates competitive distortions because traditional phone companies receive implicit subsidies from competitors for voice service, while wireless and other companies largely compete without the benefit of such subsidies. Most concerning, the current [intercarrier compensation] system is unfair for consumers, with hundreds of millions of Americans paying more on their wireless and long distance bills than they should in the form of hidden, inefficient charges. We need a more incentive-based, market-driven approach that can reduce arbitrage and competitive distortions by phasing down byzantine per-minute and geography-based charges.

*Id.*

Based on these findings, the FCC "reversed course"[21] and adopted a system called "bill-and-keep" in lieu of calling network pays as the ultimate goal for the intercarrier compensation.

> We adopt a uniform national bill-and-keep framework as the ultimate end state for all telecommunications traffic exchanged with a LEC. Under bill-and-keep, carriers look first to their subscribers to cover the costs of the network…. Bill-and-keep has worked well as a model for the wireless industry; is consistent with and promotes deployment of IP networks; will eliminate competitive distortions between wireline and wireless services; and best promotes our overall goals of modernizing our rules and facilitating the transition to IP. Moreover, we reject the notion that only the calling party benefits from a call and therefore should bear the entire cost of originating, transporting, and terminating a call. As a result, we now abandon the calling-party-network-pays model that dominated ICC regimes of the last century.

*Id.* at 17676. The FCC further stated that: "We find that although the statute provides that each carrier will have the opportunity to recover its costs, it does not entitle each carrier to recover those costs from another carrier, so long as it can recover those costs from its own end users…." *CAF Order*, 26 FCC Rcd. at 17914.

The FCC has revisited this order several times.  In particular, in the *CAF Order on Reconsideration*, the FCC extended the effective date of the bill-and-keep pricing for carriers with interconnection agreements from December 29, 2011 to July 1, 2012.  *CAF Order on Reconsideration,* 26 FCC Rcd. at 17635-36.

> Enabling carriers that have effective interconnection agreements governing the exchange of LEC-CMRS non-access traffic as of the adoption date of the *USF/ICC Transformation Order* to continue to exchange traffic and receive compensation pursuant to those existing agreements until July 1, 2012 will minimize market disruption, while enabling carriers to begin the process of revising such agreements immediately. In contrast, carriers exchanging LEC-CMRS non-access traffic without an interconnection agreement do not receive such compensation today, so we find no likelihood of marketplace disruption that

---

[21] *Id. See also* Nuechterlein & Weiser, *supra*, at 278.

would support reconsideration of our decision in that context. Accordingly, intercarrier compensation for non-access traffic exchanged between LECs and CMRS providers pursuant to an interconnection agreement in effect as of the adoption date of this Order, will be subject to a default bill-and-keep methodology on July 1, 2012 rather than on December 29, 2011.

*Id.* at 17636-37.

The FCC felt that switching to a bill-and-keep system would make sure that consumers only pay for services they choose and receive, unlike the existing system in which they pay for the other carrier's network cost, which the commission described as an "opaque implicit subsidy system." *Id.* at 17904. In this sense, then, the FCC partially abandoned the goal in the *Local Competition Order* to subsidize and thereby support competition among LECs by allowing them to recover transport and termination charges at rates designed to recover the costs of building or contracting for use of network infrastructure. In discussing the economic rationale for the new bill-and-keep approach, the FCC repeatedly contrasted this approach to "the existing reciprocal compensation rate methodology." *Id.* at 17906.

The FCC also made clear that bill-and-keep would eliminate what it viewed as "arbitrage and marketplace distortions arising from the current intercarrier compensation regimes," *id.* at 17911, which also implies that it viewed the existing regime as requiring the calling party's network to pay. Further evidence that bill-and-keep was not the default rule in place prior to the *CAF Order* is the fact, noted by the FCC in the *CAF Order* at paragraph 756, that under existing rules, bill-and-keep was limited to situations where traffic was balanced. *Id.* at 17913; *see also* 47 C.F.R. § 51.713(b) (1997) ("A state commission may impose bill-and-keep arrangements if the state commission determines that the amount of telecommunications traffic from one network to the other is roughly balanced with the amount of telecommunications traffic flowing in the

opposite direction, and is expected to remain so, and no showing has been made pursuant to § 51.711(b) [permitting asymmetrical rates based on a cost study].").[22]

At paragraph 829 of the *CAF Order*, the FCC recognizes that the obligation to negotiate and arbitrate applied to CLECs and CMRSs because "LECs have been unable to avoid terminating traffic delivered to them even absent a compensation agreement, and experience has shown that even incumbent LECs thus can be at a negotiating disadvantage in particular circumstances." *Id.* at 17946. Paragraph 830 of the *CAF Order* at first recognizes the problems all LECs face in getting agreements from CMRSs, but then states that the solution in the *T-Mobile Declaratory Order* was to allow ILECs to force interconnection agreements with CMRSs – once again providing no explanation for not allowing CLECs to also force negotiation of interconnection agreements. *Id.* But paragraph 845 appears to suggest that the FCC is now prepared to consider extending the duty to arbitrate to other contexts. *Id.* at 17955. (This may be cold comfort to CLECs. As the FCC recognized in North County, in many instances the only issue that CLECs and CMRSs had to work out was compensation for termination. Since the FCC has now ruled that bill-and-keep is the default compensation rule, there may be little or nothing left for CLECs to negotiate with CMRSs).

C. **Procedural Background of These Adversary Proceedings**

The context in which this Court faces these issues is that of a motion to dismiss. Under the Federal Rules of Civil Procedure, to survive a motion to dismiss for failure to state a claim a plaintiff must plead:

> (1) [A] short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

---

[22] The 1997 statute was subsequently amended by 47 C.F.R. § 51.713 (2011).

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8(a).

The Supreme Court's most recent decisions regarding pleading standards focus on the meaning of the second section of Rule 8. In applying the Supreme Court's decisions, the Fifth Circuit has stated: "Rule 8 does not demand detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Jabary v. City of Allen*, 547 F. App'x 600, 604 (5th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Thus, a plaintiff's claim must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). This plausibility standard is met where a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). With respect to any well-pleaded allegations "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 664.

This ruling comes at the conclusion of a second round of motions to dismiss filed in each of the three adversary proceedings, and a hearing held on those motions on June 16, 2014. An earlier round of motions to dismiss was filed in these adversary proceedings, and a hearing on those motions was held on February 7, 2014. At the conclusion of the February hearing, the Court granted the motions to dismiss, but gave Plaintiff leave to amend, instructing Plaintiff to plead with greater detail about, among other things, the tariff relied on, the state laws that Plaintiff seeks to have applied, and the time period for which termination charges are sought. In

response, Plaintiff amended the complaints to address these matters and the current versions of Defendants' motions to dismiss do not seriously contend that the complaints lack sufficient detail.  Instead the Defendants argue Plaintiff has no claim, or in the alternative, that the claims should be heard by the FCC or by the state regulators.

## II.    Liability Under Rule 20.11(b)

Plaintiff claims that it terminated traffic that originated with customers of Defendants, and that it is entitled to be paid for those termination services either under the plain language of Rule 20.11(b), or under an equitable quantum meruit or unjust enrichment theory.[23]  *See, eg.,* Pl.'s Third Am. Compl. at 13, *UPH v. Sprint Nextel Corp.*, No. 13-1096 (Bankr. W.D. Tex. Feb. 28, 2014), ECF No. 66.  Defendants respond that the state-law equitable remedies are preempted, and (somewhat inconsistently) that Plaintiff has no right to recover under Rule 20.11(b), either because any compensation that is due should be collected from Plaintiff's customers (the bill-and-keep mechanism), or because any recovery from the CMRSs can only happen pursuant to an interconnection agreement (which Plaintiff has not alleged exists), or in the event that the applicable state sets the rate in accordance with the FCC's *North County Order on Review*, and Plaintiff has not alleged that any such rate has been set by any of the applicable states.  *See, eg.,* Def. Mot. to Dismiss Pls. Third Am. Compl., *UPH v. Sprint Nextel Corp.*, No. 13-1096 (Bankr. W.D. Tex. Apr. 14, 2014), ECF No. 74.

Prior to December 29, 2011, Rule 20.11(b) provided that:

(b) Local exchange carriers and commercial mobile radio service providers shall comply with principles of mutual compensation.

---

[23] All parties agree that under the *T-Mobile Declaratory Order*, Plaintiff cannot collect termination charges for intraMTA traffic through its tariffs.

> (1) A local exchange carrier shall pay reasonable compensation to a commercial mobile radio service provider in connection with terminating traffic that originates on facilities of the local exchange carrier.
>
> (2) A commercial mobile radio service provider shall pay reasonable compensation to a local exchange carrier in connection with terminating traffic that originates on the facilities of the commercial mobile radio service provider.

47 C.F.R. § 20.11(b) (2011).[24]

This language is clear and unequivocal, and unquestionably matches the allegations of the live complaints. Indeed the language is so clear – except on the subject of what rate to apply – that unless Defendants can show clearly contrary authority in the statute, cases, or FCC decisions, it should be enforced.

Defendants have not made this showing. First, the language is entirely consistent with the principle that the originating carrier pays termination costs, a principal carried forward by the *Local Competition Order* and the *T-Mobile Declaratory Order*, and not rejected until the *CAF Order*, when it was first rejected for CMRS-LEC traffic. Second, the clearest expression of the FCC's view on the matter comes from the *North County Order on Review*. In that case, the CMRS contested liability on the grounds that absent an interconnection agreement, a default bill-and-keep rule should apply, meaning no compensation was payable to the CLEC.[25] In rejecting this position, the FCC implicitly accepted that Rule 20.11(b) means what it says, and upheld the Enforcement Bureau's decision to send the parties to the CA PUC to set an appropriate rate. *Id.*

---

[24] The 2011 statute was subsequently amended by 47 C.F.R. §20.11 (2012).

[25] *North County Order on Review,* 24 FCC Rcd. at 14038 ("In MetroPCS' view, a default 'bill-and-keep' arrangement exits…"). And this is contrary to what on Defendant claimed during the hearing on the motion to dismiss. *See* Mot. to Dismiss Hr'g Tr. 27, June 16, 2014, *UPH v. T-Mobile*, No. 13-1094 (Bankr. W.D. Tex. Feb. 7, 2014), ECF No. 86. ("Well, the CMRS carrier in North County had conceded its liability.") "Conceding" that your liability is -0-, is contesting liability.

at 14036-37. In doing so, the FCC reserved for itself only questions such as statute of limitations and interest on the ultimate award. *Id.* at 14045.

Defendants make much of the fact that, in footnote 55 of the *Bureau Merits Order,* the Enforcement Bureau appeared to reserve the issue of whether any compensation would be payable absent an interconnection agreement. *Bureau Merits Order*, 24 FCC Rcd. at 3814. However, in the *North County Order on Review*, the FCC made no mention of this footnote, and the footnote is flatly inconsistent with the reservation the FCC did make as to limitations and interest. *See North County Order on Review,* 24 FCC Rcd. 14036.

The ruling by the FCC in the *North County Order on Review*, that compensation is due under the plain terms of Rule 20.11(b) subject to a state PUC rate determination, is consistent with another FCC ruling, *Airtouch Cellular v. Pacific Bell*, 16 FCC Rcd. 13502 (2001). The regulatory landscape has changed since then, but the language in Rule 20.11 interpreted by the FCC in *Airtouch* is identical[26] and the ruling was cited by the FCC favorably in the *North County Order on Review*. *North County Order on Review*, 24 FCC Rcd. at 14039 n.39. In *Airtouch*, a CMRS sued an ILEC to recover the costs of calls terminated by the CMRS that originated on the ILEC's facilities. *Airtouch*, 16 FCC Rcd. at 13503-04. Although there was an interconnection agreement, the existence of the agreement was irrelevant as it did not address termination charges of this type, and the agreement played no role in the FCC's ruling, except that, the FCC ruled that the CMRS did not waive its right to compensation by entering into an interconnection agreement that did not address termination charges. *Id.* at 13508. Ultimately, the FCC found that

---

[26] *Compare* 47 C.F.R. § 20.11(b) (2001), *with* 47 C.F.R. § 20.11(b) (2005) (the language in Rule 20.11 was not amended to remove the "reasonable compensation" requirement until 2012).

the ILEC violated Rule 20.11 when it failed to pay mutual compensation to the CMRS provider. *Id.* at 13509.[27]

The Tennessee Regulatory Authority ("TRA") reached the same conclusion in *In re Cellco Partnership*, T.R.A. Arb. [Dkt. No. 03-00585] (February 13, 2014) (Allison et.al, Arb.). In *Cellco*, several CMRS providers asked the TRA to arbitrate several issues that prevented the providers from executing interconnection agreements with several rural and small LECs. *Id.* at 1. At issue was the rate for transportation and termination of non-access traffic exchanged between the parties. *Id.* at 2. On January 12, 2006, the arbitration panel found that rates should be based on the TELRIC model and adopted a rate that they had previously established for Bellsouth until the TRA set a permanent rate. *Id.* at 23. In 2007, the panel reversed its decision and granted the LECs request to suspend the use of TELRIC in favor of "an alternative, less burdensome, pricing method." *Id.* at 3. Then, the docket sat dormant for several years. *Id.* at 4.

In the meantime, the FCC released the *CAF Order* which held that bill-and-keep would be the default compensation methodology for terminating calls. *Id.* at 4. After the *CAF Order*, the CMRS providers in *Cellco,* as in this case, argued that bill-and-keep was the appropriate methodology to use for carriers without compensation agreements, that it was already in effect, and that the docket could be closed. *Id.* at 5-6. The rural LECs acknowledged that bill-and-keep would be the default rate after July 1, 2012, but argued that the *CAF Order* did not affect the need to set a permanent rate for the time period prior to July 1, 2012. *Id.* at 6. On April 8, 2013, the TRA determined that it still needed to establish a permanent rate for traffic exchanged between the parties prior to July 1, 2012. *Id.* at 9-10. One of the CMRS providers, AT&T Mobility, argued that the rate should be zero because the *CAF Order* required the TRA to order

---

[27] Significantly, the FCC in *Airtouch* noted that the two year statute of section 415(b) would apply. *Id.* at 13504.

bill-and-keep.  *Id.* at 11.  It further argued that any rate established by the TRA, other than bill-and-keep, would violate section 251, even for traffic exchanged prior to July 1, 2012.  *Id.*  It also argued that it would be a waste of time and resources to establish a rate for traffic prior to the effective date of the *CAF Order* and that, because the rural LECs failed to bill pursuant to the interim rate while this matter was pending, any bills submitted now would be unverifiable.  *Id.* at 11-12.

Ultimately, the TRA found that the *CAF Order* was "clearly prospective," and concluded that bill-and-keep was not the proper methodology to apply to traffic terminated prior to the effective date of the *CAF Order*.  *Id.* at 19-20.  It then proceeded to consider what the final compensation rates should be, and applied the rural LECs proposed rates, finding them to be "just, reasonable, and nondiscriminatory."  *Id.* at 24-25.

Notwithstanding the *North County Order on Review, Airtouch,* and *Cellco,* and the plain language of Rule 20.11(b), Defendants insist that absent an interconnection agreement, no compensation is payable. To get to this position, Defendants must tread a long and tortuous path. First, they point to the language of section 251(b)(5), which imposes on all LECs – both incumbent and competitive – "[t]he duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications."  47 U.S.C. § 251(b)(5) (2001).  They then point to numerous instances in which the FCC expresses its "preference" for interconnection agreements.  *See, e.g.*, Def. Leap Wireless and Cricket's Corrected Mot. to Dismiss Second Am. Compl. at 7, *UPH v. Leap Wireless Int'l*, No. 13-1102 (Bankr. W.D. Tex. Mar. 3, 2014), ECF No. 55 (citing *T-Mobile Declaratory Order*, 20 FCC Rcd. at 4863).

That this preference exists is understandable. It is axiomatic that a price set for termination that is the product of an arms-length bargain in a properly functioning market with

full information available to all participants will be the most efficient price. It would certainly be preferable to the TELRIC-based price required by the *Local Competition Order* – the "opaque implicit subsidy system"[28] – which was designed to be an artificial incentive to increase competition in the local market. And by moving to a bill-and-keep regime, the FCC may indeed be empowering consumers by the choices they make to drive the market for termination services.[29] However, this has not been a properly functioning market. First, CLECs have no choice but to carry and terminate the traffic sent to them by CMRSs. Second, each CLEC has a monopoly with respect to its customers; although each CLEC must carry and terminate the traffic sent, the CMRS has no choice about where to route the traffic if the CMRS's cell phone customer chooses to call a customer of a particular CLEC. Although each would seem to have some leverage in this situation, the leverage is not symmetrical as the rights and obligations are not the same. Third, the traffic may not be reciprocal; if the traffic stimulation allegations are true, for example, it might be the case that all or most of the traffic is going from the CMRS to the CLEC.

There are rules in place that address these asymmetries in the case of ILECS and CMRSs – each can force the other to an arbitration that will result in an interconnection agreement. For reasons that remain unclear, however, no such rules are in place for CLECs and CMRSs. Although the *CAF Order* appears to recognize this as a problem, no rules have yet been put in place to address this issue. *See CAF Order*, 26 FCC Rcd. at 17946-55. Thus, in the situation where the traffic all goes from the CMRS to the CLEC, the CMRS has neither incentive nor

---

[28] According to the *CAF Order*, 26 FCC Rcd. at 17904.

[29] *Id.* Although the move seems to be at least in part spurred by anecdotal allegations by CMRS providers that traffic stimulation is occurring, *see CAF Order*, 26 FCC Rcd. at 17663, 17676, 17874, an allegation that has also surfaced in these adversary proceedings. *See e.g.,* Def. Leap Wireless and Cricket's Am. Mot. to Dismiss Second Am. Compl. at 2 n.6, *UPH v. Leap Wireless Int'l*, No. 13-1102 (Bankr. W.D. Tex. Mar. 3, 2014), ECF No. 55.

obligation to enter into a reciprocal compensation arrangement with the CLEC, which renders the statutory obligation on the CLEC to establish an "arrangement" a nullity, if not an oddity. This Court therefore declines the invitation from Defendants to conclude that since the FCC "prefers" interconnection agreements, it must be the case that without an interconnection agreement, no compensation can be paid.

But Defendants are not done with their journey. While they acknowledge that the *CAF Order's* bill-and-keep rule is prospective in application, they also argue that in fact bill-and-keep is the rule retrospectively. This they base on the FCC's determination in the *CAF Order* that reciprocal compensation under section 251 should be considered synonymous with reasonable compensation under Rule 20.11(b). Defendants then say that this interpretation, which can be given retrospective effect, together with two stray statements contained in the *CAF Order* and the *CAF Order on Reconsideration*, establishes that reasonable compensation must mean bill-and-keep, and the FCC must have meant that from the time of the *T-Mobile Declaratory Order*.

The first passage of the *CAF Order on Reconsideration* cited by the Defendants is at paragraph 7, where the FCC distinguished carriers who were being paid under interconnection agreements from those who were not, and set a different effective date for the two. *CAF Order on Reconsideration*, 26 FCC Rcd. at 17636-37. The language in question – "… do not receive such compensation today…" obviously refers to carriers who do not receive compensation under agreements. *Id.* The language cited, and the passage cited, do *not* suggest that carriers must have agreements to be paid under Rule 20.11(b) as in effect prior to the effective date of the *CAF Order*. The second passage from the *CAF Order* cited by Defendants reads as follows:

> First, for reciprocal compensation between CMRS providers and competitive LECs, we have until recently had no pricing methodology applicable to competitive LEC-CMRS traffic, as reflected in the fact that the carriers in the recent North County Order had specifically asked the Commission to establish

one for the first time. Competitive LECs thus had no basis for reliance on such a methodology in their business models, and we see no reason why, in setting a methodology for the first time, we should not require competitive LECs to meet that methodology immediately, particularly given that competitive LECs are not subject to retail rate regulation in the manner of incumbents, and therefore have flexibility to adapt their businesses more quickly.

*CAF Order¸* 26 FCC Rcd. at 18038. Of course, all this passage says is that no pricing methodology is in place; it does not say that no right to compensation is in place.[30]

Finally, because CLECs cannot force negotiation of an agreement with CMRSs, the fact that they have no agreement cannot mean they breached their duty under section 251, which in turn means that they have not forfeited any rights under Rule 20.11(b). Indeed, in equating reciprocal compensation under section 251 with reasonable compensation under Rule 20.11(b), the FCC said nothing about changing the meaning of Rule 20.11(b) on a retrospective basis.[31]

In short, the FCC has never said that Rule 20.11(b) does not mean what it says. The FCC's clearest statement of the law comes from the *North County Order on Review*, which acknowledges that reasonable compensation must be paid, but the rate must be set by the states.

---

[30] Defendant Leap Wireless cited the FCC's *Small Entity Compliance Guide* as reflecting the FCC's view that no compensation is payable absent an agreement. Reply of Defs. Leap Wireless and Cricket to Pl. Mot. to Dismiss Sec. Am. Compl. at 2, *UPH v. Leap Wireless Int'l*, No. 13-1102 (Bankr. W.D. Tex. Mar. 3, 2014), ECF No. 69. *See Small Entity Compliance Guide: Reciprocal Compensation Arrangements Between Local Exchange Carriers and Commercial Mobile Radio Service Providers*, 20 F.C.C. Rcd. 12158, 12159 (2005). However, in the guidance document itself, the FCC says it "is not intended to replace the [FCC's] rule/s." Moreover, the guide mostly discusses ILECs; where it does discuss LECs, it simply says they cannot impose charges for non-access traffic with tariffs. *Small Entity Compliance Guide*, 20 F.C.C. Rcd. at 12159.

[31] The argument that bill-and-keep was the law prior to the *CAF Order* ignores the fact that bill-and-keep was limited to situations where traffic was balanced, see 47 C.F.R. § 51.713(b)(1997) (amended in 2011), and ignores the repeated references in the *CAF Order* to the fact that moving to bill-and-keep more generally was a change in the law. See the discussion of the *CAF Order* above.

### III.     Primary Jurisdiction Referral

In discussing primary jurisdiction, both sides rely on *Wagner & Brown v. ANR Pipeline Co.*, 837 F. 2d 199 (5th Cir. 1988).  In *Wagner & Brown*, the district court dismissed a natural gas purchase contract dispute in order to defer to the Federal Energy Regulatory Commission. The Fifth Circuit affirmed the decision to defer to the regulator, but directed the district court to stay the dismissal for 180 days to allow the regulator to exercise its jurisdiction.  *Id.* at 200.  In doing so, the Fifth Circuit suggested a number of factors that this Court finds useful in considering Defendants' request to defer to the FCC.

First, the primary jurisdiction doctrine is invoked when resolution of the claim requires the "resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body…." *Id.* at 201 (quoting *United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 64 (1956)).  Application of the doctrine is especially appropriate where "uniformity of certain types of administrative decisions is desirable, or where there is a need for the 'expert and specialized knowledge of the agencies.'" *Wagner & Brown,* 837 F. 2d at 201. (citing *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 919 (5th Cir. 1983) (quoting *Western Pacific*, 352 U.S. at 65)).  Also, the court must weigh the benefits of an agency decision against the need to resolve the litigation expeditiously, and should consider the cost to the parties. *Wagner & Brown,* 837 F. 2d at 201.  Application of the doctrine is within the discretion of the district court. *Id.*

In this case, application of these factors is straightforward.  The attempt by CLECs to get a rate determined by a state agency in California has been ongoing for over seven years, and based on the CA PUC's statements in the *North County Order on Review*, no end is in sight.  It is true that the LECs in Tennessee were able to get a determination from the TRA, but that effort

took eleven years. *In re Cellco Partnership*, T.R.A. Arb. [Dkt. No. 03-00585] (February 13, 2014) (Allison et.al, Arb.).  Clearly, the resolution of these adversary proceedings, let alone the administration of this bankruptcy case, cannot await the outcome of such protracted proceedings. Defendants have argued that with the guidance provided by the FCC in the *North County Order on Review*, getting a rate from the states should not be that difficult – however, the CA PUC had the benefit of that guidance, and still refused to act. *See Northwinds Abatement, Inc. v. Employers Ins. of Wausau*, 70 F. Supp. 2d 699, 707 (S.D. TX 1999) (judicial determination can proceed where agency had the opportunity to act but did not do so).

Also relevant to this Court's decision to proceed is the fact that this issue has been resolved on a prospective basis by the FCC in the *CAF Order*.  This Court's ruling will affect no markets, nor will it alter the business practices of market participants on a going forward basis. It will only decide a dispute between the parties before this Court, and thus "uniformity of … [an] administrative decision" is not a factor.

Of course, California is not the only state from which a rate is needed; and a rate is not needed from Tennessee.  Accordingly, if Defendants wish to seek a rate from states other than California they are free to do so (and the Court welcomes any help a state PUC wishes to provide on this issue), but while they are doing so, these adversary proceedings will not be stayed or abated in any way.  If Defendants obtain a rate from a state regulatory agency in the next 120 days, this Court will consider the application of that rate on three conditions: (1) satisfactory progress has been made in developing an agreed pre-trial discovery and scheduling order, (2) satisfactory progress has been made on discovery, and (3) applying the rate will not impair the expeditious and efficient resolution of these cases.

## IV.    Preemption, Damages, and Limitations

The clarity of the *North County Order on Review* leads this Court to conclude that state law remedies, such as quasi-contract or quantum meruit, for recovery of termination charges for intraMTA traffic, are preempted – but only in part - by Rule 20.11(b), and that (subject to the tolling put in place by the CA PUC), the two-year limitation period contained in 47 U.S.C. § 415(c) (2014) applies to Plaintiff's claims for recovery of intraMTA charges.[32]

Congress can expressly preempt state law in federal statutory law, or it can impliedly preempt state law. *Castro v. Collecto, Inc.,* 634 F.3d 779, 785 (5th Cir. 2011).    Implied preemption may take two forms: field preemption and conflict preemption. *Id.*  Field preemption is exercised "where federal law 'is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation.'" *Id.* (citing *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Conflict preemption is exercised "(1) where complying with both federal law and state law is impossible; or (2) where the state law 'creates an unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Castro*, 634 F.3d at 785 (quoting *Wyeth v. Levine*, 555 U.S. 555, 563–64 (2009) (internal quotation marks omitted)). In the instant case, both field preemption and conflict preemption apply.  This is so because a sufficiently comprehensive federal regulatory scheme for intercarrier

---

[32] Plaintiff says that his right to compensation for intraMTA traffic extends to July 12, 2012.  Pl.'s Second Am. Compl., *UPH v. Sprint Nextel Corp.*, No. 13-1096 (Bankr. W.D. Tex. Dec. 11, 2013), ECF No. 59. In fact, the *ICC Reform Order* imposed bill-and-keep for CMRS-LEC traffic as of December 29, 2011. The FCC later extended that date to July 1, 2012 but that was only for LECs with compensation agreements in place with CMRS providers. *See CAF Order on Reconsideration*, 26 FCC Rcd. at 17635.  Since Plaintiff concedes that Pac-West had no agreements with Defendants, and since the Court holds that Plaintiff's quasi-contract remedies are preempted, the applicable date is December 29, 2011.

compensation exists and allowing state law remedies for essentially the same claims would frustrate congressional objectives.

However, where the scheme established by the 1996 Telecommunications Act does not answer a particular question, and if state law remedies would complement, and not frustrate, the federal scheme, section 414 of Title 47 applies. Section 414 states: "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 47 U.S.C. § 414 (2001). "The savings clause [section 414] leads this court to conclude that Congress intended the Federal [1934] Communications Act to supplement, and not completely preempt, the state law that applies in this instance." *Castellanos v. U.S. Long Distance Corp.*, 928 F. Supp. 753, 756 (N.D. Ill. 1996) (holding that federal communications law did not preempt state law applicable to the practice of switching long distance telephone carriers without the consent of the affected consumer).

In the case of intercarrier compensation, Congress and the FCC certainly intended to establish a largely comprehensive regulatory scheme. *See e.g., Local Competition Order*, 11 FCC Rcd. at 15505-06 (describing as "integrally related," the three goals of (1) opening the local exchange and exchange access markets to competitive entry; (2) increased competition in markets that are already open, including the long distance market, and (3) reforming and preserving universal service). As relevant to this case, the contours of that scheme are well defined by the FCC in the *North County Order on Review*. The right that Pac-West has to recover for termination of intraMTA traffic is Rule 20.11(b), which reflects the state of the FCC's ongoing attempt to regulate intercarrier compensation during the time frame relevant to this dispute. While one might debate how effectively the FCC has succeeded in balancing the

33

interests of CMRSs, ILECS, CLECs, and consumers, while attempting to promote local competition and fulfill the other objectives of the 1996 Telecommunications Act,[33] that the FCC intended to balance all those interests and fulfill those objectives cannot be seriously debated. For this or any other court to apply a state-law remedy as an parallel alternative to Rule 20.11(b)'s right to recovery would threaten the balance of interests and objectives struck by the FCC. *See Firstcom, Inc. v. Quest Corp.*, 555 F. 3d 669, 678 (8th Cir. 2009) (a state law claim for a remedy indistinguishable from a remedy created by the 1996 Telecommunications Act is preempted).

That said, the FCC has expressly declined to preempt the rate applied to Rule 20.11(b)'s right to recovery. *North County Order on Review*, 24 FCC Rcd. at 14041. The FCC intended that the applicable state rate-making authorities would set rates for termination of traffic that would then be applied by the FCC. *Id.* As noted above, however, and by the District Court for the Western District of Texas when ruling on Defendants Motion to Withdraw the Reference,[34] California declined the FCC's invitation, and seems particularly unlikely to set a rate now that any rate-making activity it engages in will have no prospective effect (since bill-and-keep has been established as the applicable default rate by the *CAF Order*). Accordingly, not only does this regulatory gap fall in a very limited area that the FCC has declared is not preempted, this gap is unlikely to ever be filled.

---

[33] And in the midst of a marketplace that is innovating at a rapid pace.

[34] *See, e.g.*, District Court Order Regarding Def. Sprint Nextel Corp.'s Mot. to Withdraw Ref. at 4, *UPH v. Sprint Nextel Corp.*, No. 13-1096 (Bankr. W.D. Tex. Dec. 11, 2013), ECF No. 43 ("Because the FCC has now adopted new rules for intercarrier compensation, both the FCC and the state utility commissions are apparently unwilling to expend time and effort in analyzing cases involving this regulatory gap on the theory it would amount to 'retroactive rulemaking' with no future benefit to the telecommunications industry. Courts are thus left to determine whether certain tariff rates may be applied to the traffic at issue in these cases, or whether some other equitable remedy – such as quantum meruit – is more appropriate." (citing *Manhattan Telecomms. Corp. v. Global NAPS, Inc.*, No. 08-CV-03829, 2010 WL 132095, at *2-4 (S.D.N.Y Mar. 31, 2010)).

This gap seems to be the very type of situation that section 414 was designed to address. In other words, there is a right to reasonable compensation under Rule 20.11(b), and any state law remedy that would accomplish what Rule 20.11(b) accomplishes is preempted. But what Rule 20.11(b) does not accomplish is to set the amount of compensation owed. And after years of litigation the FCC and the states involved in this case have failed to fill this gap. However, CLECs are not without remedy. Section 414 can fill this gap with state law damage remedies – such as quantum meruit or unjust enrichment. And there is respectable authority for this very interpretation of section 414.

In *Manhattan Telecomms. Corp. v. Global NAP Inc.*, MetTel terminated voice over internet protocol ("VoIP") traffic that originated with defendant Global NAPs's customers. No. 08-CV-03829 (JSR), 2010 WL 1326095, at *1 (S.D.N.Y. Oct. 21, 2010). In that case, the court observed that the FCC had preempted state regulation of VoIP services, and also determined that these services were not subject to tariffed charges. *Id.* However, the court also found that even if the filed tariff rates could not be used, "the inability to apply the tariff regime as it stands does not preclude MetTel's entitlement to recover in equity." *Id.* at 3. After determining that the FCC had failed to provide an answer to the issue of whether MetTel could recover from Global NAPs, the court, relying on section 414, used the doctrine of unjust enrichment to fill the gap. *Id.* The court clarified that by using an equitable remedy to fill the regulatory gap, it was not undermining the FCC's rate making authority, but instead was "merely filling the gap left by the FCC's pronouncements." *Id.* The Court in this case faces a similar situation. The FCC told CLECs, like Pac-West, to get a rate determination from state PUCs. Pac-West attempted to get a rate determination from the CA PUC, which refused. Instead of finding that this regulatory omission means that Plaintiff is entitled to no compensation, contrary to the clear intent and plain

35

language of Rule 20.11(b), the appropriate course of action at this time is to use section 414 to fill the regulatory gap with equitable remedies, as did the court in *Manhattan Telecomm.*

In addition, if the FCC sees "nothing anomalous about a state commission establishing an intrastate rate to effectuate a compensation right arising from federal law,"[35] there should be no impediment to allowing state law, as a supplement to federal law under section 414, to establish "reasonable compensation" in the absence of a rate determination by a state commission. 47 C.F.R. § 20.11(b)(2) (2011).

Finally, the FCC has both given states wide discretion to establish rates for compensation under Rule 20.11(b), and has acknowledged that there is a complete vacuum at the federal level on the subject of compensation under Rule 20.11(b).  Specifically, in the *Bureau Merits Order,* the FCC affirmed the direction of the Enforcement Bureau to the CA PUC to determine what constitutes reasonable compensation "via whatever procedural mechanism [the CA PUC] deems appropriate under state law," 24 FCC Rcd. at 3810-11; s*ee also North County Order on Review,* 24 FCC Rcd. at *14040. The FCC also recognized that it had "declined to provide guidance to the states on how to carry out that responsibility," *CAF Order,* at 26 FCC Rcd. at 18036, and had established no federal "pricing methodology," *id.* at 18038.  Thus, the federal scheme as it existed during the time frame in question gave states wide discretion (though none had then exercised it) with no guidance from the FCC.  That scheme, as it relates to the narrow subject of compensation under Rule 20.11(b), will hardly be in conflict with, or even frustrated by, the use of various states' equitable remedies to determine compensation under Rule 20.11(b) for that limited period of time.  *See Bruss Co. v. Allnet Commc'n  Servs. Inc.,* 606 F. Supp. 401, 411 (N.D. Ill. 1985) (section 414 preserves causes of action that do not conflict with provisions of the

---

[35] *North County Order on Review*, 24 FCC Rcd. at 14041 n.53.

1934 Communications Act, nor frustrate the regulatory scheme implemented by Congress); *see also, Marcus v. AT&T Corp.*, 138 F.3d 46, 54 (2d Cir. 1998) (state law remedies are preserved by section 414 for areas not addressed by federal law).

Having determined that Plaintiff has a substantive right to recovery and that this substantive right is found in Rule 20.11(b), the Court also determines that the two-year limitation contained in section 415 applies.[36] First, the action is none other than one "by [a] carrier[] for recovery of … lawful charges." 47 U.S.C. § 415(a) (2014). Second, the FCC has itself determined that actions under Rule 20.11(b) are governed by the two-year limitation in section 415. *Airtouch*, 16 FCC Rcd. at 13504. Third, in *AT&T Comm'cns of the Mountain States, Inc. v. Qwest Corp.,* the court found that an action for charges sought under a privately negotiated interconnection agreement, subject to interpretation under state law, but also subject to federal law governing carrier interconnection, was governed by the two-year limit of section 415(a). No. 07-CV-00783, 2007 WL 1342657 at *1 (D. Utah May 4, 2007). In so finding, the court noted that a longer state law limitation period would be in conflict with and therefore was preempted by the two-year federal law limit. *Id.* at 1 n.1.

Furthermore, the Fifth Circuit's decision in *Castro* does not compel a different result. *Castro,* 634 F.3d at 781. In *Castro*, a debt buyer had purchased cell phone bills owed by customers to a CMRS, and the bills were being pursued against the customer by a debt collector. *Id.* at 781-82. The customer then sued the debt collector for violations of the Federal Debt Collection Practices Act. *Id.* at 781-83. The court held that the state law four-year limit was not preempted by the two-year limit of section 415(a) because at issue were the state law contract issues governing the contract between the customer and the CMRS, and consumer protection

---

[36] Subject to the tolling ordered by the CA PUC.

issues. *Id.* at 784-85, 787. Because the court found section 415(a) ambiguous on whether it only applies to tariffed charges, it declined to interpret "lawful charges" in such a way that conflict preemption would apply to preempt state statutes of limitations governing state contract and consumer protection law. *Id.* at 786-87. Unlike *Castro*, this Court is not tasked with determining the appropriate statute of limitations for state law claims, but rather for claims under Rule 20.11(b), which is part of a comprehensive federal regulatory scheme.

Finally, the Court's application of a state law equitable remedy to fill the gap left in the absence of a state-determined rate also does not change this result. Even state law claims seeking the "recovery of charges" described in section 415(a) have been held subject to the two-year limit – on the basis that Congress clearly intended to have a two-year limit applied to charges of that nature. *See AT&T Comm'cns of the Mountain States,* 2007 WL 1342657 at *1 (interconnection agreement dispute subject to section 415(a)); *MFS Intern. Inc. v. Int'l Telecom Ltd.,* 50 F. Supp. 2d 517, 520 (E.D. Va. 1999) (even putative state law claims against carriers encompassed within the broad language of section 415(b) are subject to federal two-year limit).

Here, Plaintiff's claim arises under federal law, Rule 20.11(b), and the two-year federal statute of limitations applies.

## V.   Conclusion

For the reasons stated above as to the intraMTA issues, and as stated on the record of today's date as to interMTA issues, the Motions to Dismiss filed by the Defendants are denied.

Orders will issue to this effect.